E-filing

HARRINGTON, FOXX, DUBROW & CANTER, LLP
KEVIN J. GRAY, State Bar No. 142685
655 Montgomery Street, Suite 1100
San Francisco, California 94111
Telephone (415) 288-6600
Facsimile (415) 288-6618
kgray@hfdclaw.com

Attorneys for OFFICEMAX NORTH AMERICA, INC.

FILED
MAR 27 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

MURRAY GORDON, JANET GORDON, CO-TRUSTEES OF THE GORDON FAMILY TRUST AND LOIS ARNOLD, TRUSTEE OF THE RICHARD ARNOLD FAMILY TRUST,

Plaintiffs,

v.

OFFICEMAX, INC., DOES 1-20,,

Defendants.

CASE NO. CV 08 1677 EDL

**NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441, 1446**

(Contra Costa County Superior Court Case No. C08-00405 )

PLEASE TAKE NOTICE that Defendant OFFICEMAX NORTH AMERICA, INC. ("OfficeMax"), by and through its undersigned counsel, hereby removes this action to the United States District Court for the Northern District of California, Oakland Division pursuant to 28 U.S.C. § 1446 , invoking this court's jurisdiction under 28 U.S.C. §§ 1332(d) and 1441(a). Removal is proper for the following reasons:

**BACKGROUND**

1. On or about February 19, 2008, plaintiffs Murray Gordon, Janet Gordon, Co-Trustees of the Gordon Family Trust, and Lois Arnold, Trustee of the Richard Arnold Family Trust ("Plaintiffs"), commenced the instant action in the Superior Court of the State of California,

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

County of Contra Costa, entitled *Murray Gordon, Janet Gordon, Co-Trustees of the Gordon Family Trust, and Lois Arnold, Trustee of the Richard Arnold Family Trust v. OfficeMax, Inc., et al.*, Case No. C08-00405 ("Complaint"). A copy of the Complaint is attached as Exhibit A.

2. The Complaint purports to assert a claim for breach of contract against OfficeMax stemming from OfficeMax's lease of premises from Plaintiffs.

**TIMELINESS OF REMOVAL**

3. Plaintiffs served OfficeMax with the Summons and Complaint in this matter on February 26, 2008. A copy of the Summons is attached as Exhibit B.

4. On March 27, 2008, OfficeMax filed its Answer in state court. This Answer is attached as Exhibit C.

5. Removal is timely because OfficeMax filed its Answer and its Notice of Removal within thirty days of service of the Complaint, on February 26, 2008. 28 U.S.C. § 1446(b);

**DIVERSITY JURISDICTION**

A. Diversity of Citizenship

6. Plaintiffs were lessors of property in Contra Costa County, California, the lease for which identifies Plaintiffs' place of business as Oakland, California. Upon information and belief, Plaintiffs are citizens of the state of California. See Complaint at ¶ 1, and Exhibit A to the Complaint, Introduction.

7. OfficeMax is a corporation incorporated under the laws of Ohio, with its principal place of business located in Illinois and thus is a citizen of Ohio and Illinois. See 28 U.S.C. § 1332(c).

8. Pursuant to 28 U.S.C. § 1441(a), the residence of fictitious and unknown defendants should be disregarded for purposes of establishing removal jurisdiction under 28 U.S.C. § 1332. Thus, the existence of Doe defendants one through twenty, inclusive, is irrelevant.

9. Because at least one defendant is incorporated and has its principal place of business outside California, and plaintiffs are citizens of California, the minimal diversity requirement of 28 U.S.C. § 1332(d)(2)(A) is satisfied.

10. There is no basis for the Court to refuse to exercise jurisdiction under 28 U.S.C. § 1332(d)(3) or (d)(4). Along with the satisfaction of other applicable requirements, the fact that no defendant is incorporated or has its principal place of business within California is sufficient to confer jurisdiction. 28 U.S.C. § 1332(d)(4)(A)(i)(II)(cc) and § 1332(d)(4)(B).

B. Amount in Controversy

12. On the face of Plaintiffs' Complaint, the amount in controversy exceeds the sum or value of $75,000, as required by 28 U.S.C. § 1332(d)(2) and 1332(d)(6). See Complaint at ¶¶ 10-16, 21, 25. By this allegation and the statements contained in this Notice of Removal, Defendant does not concede that Plaintiff is entitled to any damages, including amounts in excess of $75,000. Nevertheless, the aggregated claims establishes an amount "in controversy" in excess of $75,000 exclusive of interests and costs. Plaintiffs expressly allege that OfficeMax failed to pay $4,227.84 (Complaint at ¶ 10), $5,637.12 (Complaint at ¶ 11), $5,637.12 (Complaint at ¶ 12), $4,412.64 (Complaint at ¶ 13), $1,470.55 (Complaint at ¶ 14), $1,879.04 (Complaint at ¶ 15), less a credit of $2,081.24 (Complaint at ¶ 16). Plaintiffs also expressly allege that OfficeMax is required to pay for damage to the premises, costing in excess of $87,000 (Complaint at ¶ 21). Finally, Plaintiffs allege that OfficeMax is required to pay $2,442.68 in power costs (Complaint at ¶ 25).

13. Accordingly, all of the requirements for federal jurisdiction under 28 U.S.C. § 1332(d)(2) are satisfied, and removal of this action is proper under 28 U.S.C. §§ 1441 and 1446.

**VENUE**

15. Pursuant to 28 U.S.C. § 1441(a) and 1446(a), any action over which the district court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) may be removed to the Federal District Court for the district and division within which such action is pending. The action being removed was filed and is pending in the California Superior Court of the County of Contra Costa. Accordingly, this Notice of Removal is properly filed in the United States District Court for the Northern District of California, Oakland Division.

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

**NOTICE OF REMOVAL**

16. Pursuant to 28 U.S.C. § 1446(d), OfficeMax will promptly serve on Plaintiffs and file with the Superior Court a "Notice to Adverse Party of Removal to Federal Court." Pursuant to Federal Rule of Civil Procedure 5(d), OfficeMax will also file with this Court a "Certificate of Service of Notice to Adverse Party of Removal to Federal Court."

WHEREFORE, OfficeMax respectfully requests that the above referenced State court action be removed to this Court, that this Court take such steps as are necessary to achieve the removal of this matter from the Contra Costa County Superior Court, and that this Court make such other orders as may be appropriate to effect the preparation and filing of a true record in this cause of all proceedings that may have been had in the state court action.

DATED: March 27, 2008

HARRINGTON, FOXX, DUBROW & CANTER, LLP

By: ______________________
KEVIN J. GRAY
Attorneys for OFFICEMAX NORTH AMERICA, INC.

**Shelley A. Gordon**
Law Offices of Shelley A. Gordon, Bar No. 88475
1946 Embarcadero, Ste. 200
Oakland, CA 94606
ph 510 535-1652 fax 510 535-2579
Attorney for Plaintiffs

LEGAL DEPARTMENT
FEB 28 2008
LITIGATION

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF CONTRA COSTA**

**MURRAY GORDON, JANET GORDON, CO-TRUSTEES OF THE GORDON FAMILY TRUST AND LOIS ARNOLD, TRUSTEE OF THE RICHARD ARNOLD FAMILY TRUST,**

**Plaintiffs,**

**vs.**

**OFFICEMAX, INC., DOES 1-20, DEFENDANTS.**

**Case No. C 08 00405**

**COMPLAINT FOR DAMAGES, BREACH OF CONTRACT, COMMON COUNTS**

Plaintiff alleges:

1. Plaintiffs were and at all times herein mentioned the owners and Lessors of real property situated in Concord, Contra Costa County, California, known as 1795 Willow Pass Road, Concord, hereinafter referred to as "the Subject Property.".

2. Plaintiff is informed and believes and thereon alleges that Defendant OFFICEMAX, INC. was at all times herein mentioned, a Delaware corporation doing business in California.

3. Defendants DOES 1-20, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to plaintiff. When their true names and capacities are ascertained, plaintiff will amend this complaint by inserting their true names and capacities herein.

4. Plaintiff is informed and believe and thereon alleges that each of the fictitious named defendants is responsible in some

manner for the occurrences herein alleged and that Plaintiffs injuries and damages as herein alleged were proximately caused by their conduct.

5. On or about December 27, 1991 Plaintiffs entered into a written agreement with BizMart, Inc., Defendants' predecessor in interest for a fifteen year "triple Net" lease for the "subject premises" in Contra Costa County. A copy of this contract ("Lease agreement") is attached to this complaint as Exhibit A and made a part of this complaint by reference.

6. On or about June 1, 1993, Defendants took over the operations of BizMart, Inc. and took on all the rights and obligations of BizMart,Inc. with respect to the Lease Agreement.

7. The Lease Agreement obligated Defendants to pay certain monies in additional to rent for Common Area Maintenance charges and for Management Fees incurred by Plaintiffs.

8. The Lease Agreement provides for the defaulting party to reimburse the non-defaulting party for reasonable attorneys fees.

FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

9. Plaintiffs incorporate by reference Paragraph 1-8 of the Complaint as though fully set forth herein.

10. On or about June 1, 2004 Defendants were billed $4227.84 for Landlord's Management fees due under the Lease Agreement, Paragraph 34.4 and Defendant refused to pay any of that amount due.

11. On or about June 1, 2005, Defendants' were billed $5637.12 for Landlord's Management fees due under the Lease Agreement, Paragraph 34.4, and Defendants refused to pay any of that amount

due.

12. On or about June 1, 2006, Defendants were billed for $5637.12 for Landlord's Management fees due under the Lease Agreement, Paragraph 34.4, and Defendants refused to pay any of that amount due.

13. On or about May 15, 2006, Defendants' were billed $65,983.20 for annual Common Area Maintenance charges and paid only $61,570.56. leaving a balance due and owing in the amount of $4412.64 for 2006.

14. On or about April 30, 2007, Defendants were billed $21,994.40 for Common Area Maintenance charges due and owing between 1-1-07 and 4-30-07 and paid only the sum of $20,523.52 leaving a balance due and owing in the amount of $1470.55 when they vacated the premises at the termination of the Lease Agreement on or about April 30, 2007.

15. Defendants were billed for and failed to pay any part of the Landlord's Management Fees due and owing in the amount of $1879.04 for the period 1-1-07 to 4-30-07 when they vacated the premises.

16. At the time Defendants vacated the premises, they were credited with the sum of $2081.24 for two months property taxes and insurance paid through 6-30-07. Therefore, the total balance due and owing for Defendants' obligations stated in Paragraph 13 and 14 above is the sum of $1268.68 for 2007.

17. The failures to pay the amounts described in Paragraphs 10-16 amounted to defaults by Defendants under the terms of the Lease agreement.

18. By the terms of the Lease agreement, Paragraph 19.1,

Defendants were required to surrender to the landlord the building, structures, and plumbing, heating, ventilation and air conditioning systems, together will all alterations and replacements thereof on the premises in good order, condition and repair, except for reasonable wear and tear. Further, if any fixtures or equipment or installations of Tenants were not removed after Landlord requested that such be removed, the removal and resultant damage to the premises shall be repaired by and at the expense of tenant.

19. After Defendants vacated the premises, Plaintiffs inspected the premises and discovered that Defendants had not removed fixtures and equipment and had physically damaged the premises beyond ordinary wear and tear including but not limited to removal of panel and adhesive signage, extensive damage to drywall, fork lift damage, structural wall damage, extensive flooring damage, dismantling, failure to remove and dispose of raised floor system and railings and failure to repair to floor surface and damaged insulation barrier.

20. Plaintiffs demanded that Defendants fixtures and equipment be removed, and that the damage to the premises be repaired at Defendant's expense, but Defendant has refused and failed to do so.

21. Plaintiffs have investigated the cost of repairing the damage to the premises and have discovered that the cost will be in excess of $87,000 and according to proof.

22. Pursuant to the Lease Agreement Paragraph 8.1, Defendants were obligated to pay any and all utilities supplied to the

premises and to indemnify Landlord and hold it harmless against any liability on said account.

23. Defendant failed to cancel the power service to the premise when they vacated. Further, Defendants had altered the electrical service of the premises so that the power to a heater and air conditioner unit at the premises could not be switched off at the premises but by a remote location controlled solely by Defendant. Further, Defendants had placed the breaker for their altered unit behind a secured steel cover on a separate electrical box, and Defendants failed to inform Plaintiffs about the location of the breaker box or provide access.

24. Defendant never informed Plaintiffs as required in the Lease Agreement about the alteration of the electrical system to the remote control of the heating and air conditioning on the premises.

25. Plaintiff received a bill and was required to pay $2442.68 in charges by Pacific Gas and Electric Company due to Defendants failure to turn off the power to the heating and air conditioning unit.

26. Plaintiffs were damaged as a proximate result of Defendants breaches of contract.

27. Plaintiffs have fulfilled all of their obligations as required of them under the contract terms.

28. As a proximate result of Defendants' breaches of contract, Plaintiff has sustained damages in an amount in excess of the jurisdictional limit of this court.

SECOND CAUSE OF ACTION: COMMON COUNTS (All Defendants)

29. Plaintiffs incorporate by reference in this cause of action paragraphs 1-17 of the Complaint as though fully set forth herein.

30. Defendants became indebted to Plaintiffs within the past four years on an open book account for money due for services provided to Defendants for which they promised to pay and failed to pay when due, or when demanded.

31. The sum of $21,183.40 which is the reasonable value, is due and unpaid despite Plaintiffs' demand, plus prejudgment interest according to proof.

32. Plaintiff is entitled to attorneys fees by agreement according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows as to the First and Second Causes of Action:

1. For damages in an amount according to proof at trial for damages sustained by Plaintiff as a result of Defendants' breaches of contract;
2. For interest on this sum at the prevailing legal rate from April 15, 2007;
3. For reasonable attorney's fees according to proof;
4. For costs of suit herein incurred; and
5. For such other and further relief as the court may deem proper.

February 15, 2008

Shelley A. Gordon,
Attorney for Plaintiff

# L E A S E

THIS AGREEMENT OF LEASE (the "Lease") is made by and between Murray and Janet Gordon, Co-Trustees of the Murray and Janet Gordon Family Trust, and Richard and Lois Arnold, Co-Trustees of the Richard and Lois Arnold Family Trust, having an office at 301 Jefferson Street, Oakland, California 94607 (hereinafter collectively called the "Landlord" or "Lessor"), and BizMart, Inc., a Delaware corporation, having an office at 2000 E. Lamar Blvd., Suite 700, Arlington, Texas 76006 (hereinafter called the "Tenant" or "Lessee" or "BizMart").

## W I T N E S S E T H :

In consideration of the mutual covenants, terms, conditions and agreements contained herein, Landlord and Tenant do hereby covenant, promise and agree as follows:

## ARTICLE ONE

## Defined Terms, Premises and Term

1.1 Defined Terms. The terms "Demised Premises," "Leased Premises," and "Premises" shall be deemed to refer to the premises leased to Tenant by Landlord under this Lease and the term "Shopping Center" shall be deemed to refer to the shopping center of which the Premises is a part, and the term "Landlord's Area" shall be deemed to refer to the portion of the Shopping Center which is owned by Landlord.

1.2 Premises. Landlord hereby grants, demises and leases to Tenant, and Tenant does hereby take and hire from Landlord, upon and subject to the terms, covenants, and conditions herein set forth, the street floor and basement and mezzanine, if any, consisting of approximately 30,000 square feet of gross leasable area on the street floor as cross-hatched on the site plan attached hereto and made a part hereof as Exhibit "A" (hereinafter called the "Demised Premises"), together with all rights and appurtenances pertaining thereto and the right to use in common with other occupants of the Shopping Center, the common areas, accessways, means of ingress and egress as shown on Exhibit "A." The Demised Premises are to be located in a Shopping Center Development known as Park & Shop Shopping Center, situated in the City of Concord, County of Contra Costa, and State of California (herein called "Shopping Center"). Landlord is the owner of that portion of the Shopping Center (which portion is hereinafter called "Landlord's Area") which is outlined in red on Exhibit "A" attached hereto and legally described on Exhibit "B" attached hereto and made a part hereof. Landlord is the owner of certain rights in and to that portion of the Shopping Center (hereinafter called the "Other Portion") pursuant to the terms of that certain Grant of Easements and Parking Agreement (the "Easement") dated May 23, 1956, a copy of which is attached hereto as Exhibit "C" and made a part hereof.

1.3 Original Term. The original term of this Lease (hereinafter referred to as the "Original Term") shall be for a period commencing on the "Commencement Date" as defined in Article Two below and ending after the fifteenth (15th) Lease Year following such Commencement Date. "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of the calendar month following the Commencement Date (if the Commencement Date is not the first day of a calendar month) as defined in Article Two below, except that the first Lease Year shall include any partial month between the Commencement Date and the first day of the calendar

month following the Commencement Date. Tenant's obligation to pay rent and other amounts payable to Landlord under this Lease shall commence on the Commencement Date. Unless expressly stated to the contrary, "Term" shall refer to the Original Term and all renewal terms which are exercised by Tenant as provided below.

1.4 First Renewal Term. Tenant may, at its option exercisable by written notice delivered to Landlord at least one hundred eighty (180) days prior to the expiration of the Original Term of this Lease, extend the term of this Lease for a period of five (5) years. Tenant may not exercise its option if it has defaulted, unless Tenant has cured such default within the cure period described in Article 16, or Tenant is diligently attempting to cure a non-monetary default within the cure period as described in Article Sixteen.

Upon Tenant's giving notice of the exercise of its option to renew this Lease, this Lease shall be renewed at the rental set forth in Article Three hereof, and upon the same other terms and conditions as are applicable to the Original Term hereof, except that the renewal shall begin on the date of expiration of the Original Term and shall continue for a period of five (5) years thereafter.

1.5 Second Renewal Term. In the event Tenant shall renew this Lease for the first renewal term as provided herein, Tenant is granted the further option to renew this lease for one (1) additional period of five (5) years at the rental as set forth in Article Three hereof and upon the same other terms and conditions as are applicable to the first renewal term except that such second renewal term shall begin on the date of expiration of the first renewal term and shall continue for a period of five (5) years thereafter. Said options to renew for the second renewal term shall be subject to the same notice provisions for Tenant and the same provisions regarding Tenant's exercise of the option to renew as are applicable to the first renewal term.

## ARTICLE TWO

## Commencement Date

2.1 Commencement Date. The "Commencement Date" of this Lease shall be the earlier of the following: (a) the date that Tenant opens to the public for business at the Premises, or (b) ninety (90) days after all of the following have occurred: (i) Landlord has obtained and delivered to Tenant reasonably satisfactory evidence of the termination of any leases existing between Landlord and any other party or entity which affects the Premises, and Landlord has removed all tenants from the Premises, and (ii) Landlord has delivered the Premises to Tenant in broom clean condition with all prior tenant fixtures and other personal property removed and with the Landlord's Work (hereinafter defined) completed. Upon the execution of this Lease, Tenant shall have the right to enter upon the Premises for the limited purposes of surveying the Premises and conducting such inspections as Tenant deems necessary. Upon satisfaction of the Commencement Date contingencies referred to in Article 2.1(b)(i) and (ii) hereof, Tenant shall be entitled to possession of the Premises. Possession of the Premises shall be delivered to Tenant as provided in this Lease no earlier than January 1, 1992 and no later than April 1, 1992. If the Commencement Date contingencies referred to in Article 2.1(b)(i) and (ii) hereof are not satisfied by April 1, 1992, Tenant may terminate this Lease by written notice to Landlord, and Tenant shall have no further obligations or liabilities hereunder, or Tenant may extend the

time for the satisfaction of said Commencement Date contingencies.

2.2 Landlord's Obligations. Landlord shall perform Landlord's obligations ("Landlord's Work") described on Exhibit "D" attached hereto and incorporated by reference. Notwithstanding any provision of this Lease to the contrary, in the event that Landlord's Work has not been completed by April 1, 1992, Tenant shall have the option to: (a) perform the uncompleted items of Landlord's Work and deduct the cost of such performance, plus interest on such amount at the lesser of the maximum rate allowed by law or fourteen percent (14%) of the cost of such performance from rent and other amounts payable to Landlord under this Lease, or (b) extend the deadline for Landlord's completion of Landlord's Work.

2.3 Landlord's Contribution. Landlord shall contribute to Tenant the sum of $300,000.00 ("Landlord's Contribution") which shall be an allowance for Tenant's build-out improvements. The sum of $150,000.00 of the Landlord's Contribution shall be paid by Landlord to Tenant on or before May 1, 1992. If Tenant has not received such $150,000.00 payment on or before May 1, Tenant shall have the right to deduct the unpaid portion of such $150,000.00 payment, plus interest thereon at the lesser of (i) fourteen percent (14%) per annum or (ii) the highest rate allowed by law, from rent and other amounts payable to Landlord under this Lease. The remaining $150,000.00 of the Landlord's Contribution shall be deducted by Tenant from the Fixed Annual Net Rent payable under Article 3.1 of this Lease in the amount of $6,250.00 per month for a period of twenty-four (24) months commencing with the installment of Fixed Annual Net Rent due on June 1, 1992.

## ARTICLE THREE

### Rent

3.1 Fixed Annual Net Rent. Tenant agrees to pay to Landlord, in addition to the other payments to be made by Tenant hereunder, a Fixed Annual Net Rent (hereinafter called "Fixed Annual Net Rent") in accordance with the following schedule. The Fixed Annual Net Rent shall be payable in equal monthly installments on the first day of each calendar month during the Term. Fixed Annual Net Rent and any other charges under this Lease for any period of less than one (1) month shall be apportioned based on the number of days in that month.

Rent Schedule

| Lease Years | Monthly Rent | Annual Rent |
|---|---|---|
| 1 - 5 | $ 37,500.00 | $450,000.00 |
| 6 - 10 | $ 43,125.00 | $517,500.00 |
| 11 - 15 | $ 50,000.00 | $600,000.00 |
| 16 - 20 | See Article 3.2 | |
| 21 - 25 | See Article 3.2 | |

3.2 Rent Adjustments of Option 1 and Option 2. The Fixed Annual Net Rent for Option 1 and Option 2 shall be determined as ninety percent (90%) of the annual fair market rental rate for the Premises for each respective renewal term ("FMV"). At least three hundred sixty (360) days prior to the expiration of the Original Term of the Option 1 term, as the case may be, Landlord shall notify Tenant in writing of Landlord's estimate of FMV for the next available renewal term. Within thirty (30) days from receipt of such notice, Tenant shall notify in writing Landlord as to whether Tenant approves or rejects Landlord's estimate of

FMV. If Tenant rejects such estimate, Tenant and Landlord shall attempt to reach an agreement as to FMV, and if no agreement can be reached within thirty (30) days from the date of Landlord's original notice, Tenant shall notify Landlord in writing that (a) Tenant does not intend to exercise its next available option to renew the Lease, or (b) Tenant shall require the separate determination of FMV by two (2) qualified commercial real estate appraisers familiar with commercial rental values for the area, one of which shall be selected by Tenant and the other selected by Landlord. Each party shall bear the expense of its appraisal. Within thirty (30) days after the date of Tenant's notice that appraisal will be required, each appraiser shall submit its report to both Landlord's and Tenant, and FMV shall be determined as the average of such appraisals. Neither the agreement of Landlord and Tenant as to FMV nor the determination of FMV in accordance with this Article shall constitute the exercise by Tenant of its option to extend the Term, it being acknowledged and agreed that such option may be exercised by Tenant as provided in Article One of this Lease. Should Tenant not exercise its option Tenant shall reimburse any reasonable out-of-pocket expense incurred by Landlord for Landlord's appraisal pursuant to this Article 3.2.

3.3 Place of Payment. All amounts payable under Article 3.1, as well as all other amounts payable by Tenant to Landlord under the terms of the Lease, shall be paid at the office of Landlord set forth above, or at such other place as Landlord may from time to time designate by written notice to Tenant, in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment.

## ARTICLE FOUR

### Title

4.1 Title. The Landlord warrants, represents and covenants as a condition of this Lease that it has good indefeasible title to the Demised Premises and Landlord's Area, and the right, power and authority to make this Lease for the Term aforesaid without the consent or joinder of any other party; that the persons signing on behalf of Landlord are authorized to bind Landlord; that there are no other leases in effect covering any portion of the Demised Premises; that the provisions of this Lease do not conflict with or violate the provisions of existing agreements between the Landlord and third parties; that the Premises and the uses thereof for the purposes specified in this Lease are in conformity with all applicable legal requirements including, without limitation, zoning and planning ordinances, and do not violate applicable restrictions, if any; that Landlord will timely deliver actual possession of the Premises to the Tenant free of all tenants and occupants; that Landlord is the owner of certain rights in and to the Other Portion pursuant to the terms of the Easement, which rights are granted on a non-exclusive basis to Tenant hereunder; that the Easement is in full force and effect in the form attached hereto and has not been modified or amended; and that Landlord will not amend or modify the Easement in any manner which would materially affect Tenant's use and enjoyment of the Demised Premises or the common Area without the prior written consent of Tenant. Landlord shall furnish to Tenant a copy of Landlord's most recent title report or title policy showing Landlord's title to the Landlord's Area.

## ARTICLE FIVE

## Real Estate Taxes

5.1 Real Estate Taxes. (a) The Tenant agrees to pay the Landlord for Tenant's pro rata share of real property taxes and assessments during the Term of this Lease applicable to the Demised Premises. Landlord hereby warrants and represents that the Demised Premises are separately assessed for the purpose of real property taxes and assessments. Any such payment shall be made within thirty (30) days after the receipt by the Tenant of an invoice from the Landlord for such pro rata share, together with a copy of the tax bill covering the Demised Premises for the year in which reimbursement is sought. Such reimbursement shall be based on said taxes as if Landlord obtained the maximum discount on said taxes as allowed by law. Landlord agrees to pay said taxes within fifteen (15) days of Tenant's payment hereunder and to deliver a copy of a paid receipt for same to Tenant within fifteen (15) days of Landlord's receipt of such paid receipt.

(b) In the alternative, Landlord may reasonably determine and estimate real property taxes so that Tenant shall pay same in twelve (12) equal estimated installments, calculated on a calendar year (except if the initial term starts other than January 1, in which event the calculation shall be made based on the number of months existing prior to January 1). Landlord shall provide the estimate at least thirty (30) days prior to January 1 each calendar year during the Term. The Landlord covenants and agrees to present to the Tenant an annual statement showing an itemization of said real property taxes. The Tenant and Landlord covenant and agree to readjust all sums due to the Landlord or Tenant, as the case may be hereunder within fifteen (15) days after receipt from the Landlord of said statement, and any requested bills and evidence of payment of same for each calendar year.

(c) Landlord agrees that if any general or special assessment, whether ordinary or extraordinary is assessed against the Shopping Center including the Demised Premises which may be payable over a term of years, Landlord shall use its best efforts to obtain the maximum term for the payment of such assessment, and only such portion which falls due within each year of this Lease shall be payable by Tenant hereunder.

(d) Tenant shall not be chargeable with or be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the Demised Premises except the real property taxes and assessments mentioned in the first paragraph of this Article.

(e) Landlord agrees to notify Tenant in a timely manner of any increase in taxes or of pending assessments after receipt of the tax bill or other evidence of such increase or notice of a pending assessment, and Tenant shall have the right to contest the amount or validity of the determination thereof, and Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith.

(f) It is covenanted and agreed that in the event of a rebate for taxes or of an assessment for any reason including, but not limited to, Tenant's efforts, said rebate shall be shared by Landlord and Tenant in the same ratio that they originally shared payment of the taxes and assessments after reimbursing Tenant and Landlord for their respective costs and expenses of obtaining such rebate.

## ARTICLE SIX

### Hazardous Substances

6.1 Landlord's Representations. The Landlord represents to Tenant that it has no knowledge (a) of the presence of any Hazardous Substances (as herein defined), including transformers containing polychlorinated biphenyl ("PCBs") within the Leased Premises; or (b) of any spills, releases, discharges, or disposal of Hazardous Substances that have occurred or are presently occurring on, onto, or into the Leased Premises; or (c) of the presence at any time of any underground storage tanks or any petroleum or petroleum products on, under, or in the Demised Premises, or in storage tanks on or under the Premises ("Petroleum Tanks"). The Landlord further represents to Tenant that it has no knowledge of any failure of the Leased Premises to comply with all applicable local, state, and federal environmental laws, regulations, ordinances, and administrative and judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport, and/or disposal of any Hazardous Substances (collectively called "Environmental Laws"). As used in this Article, the term "Hazardous Substances" shall mean any substance or material defined or designated as hazardous or toxic waste, hazardous or toxic material, a hazardous or toxic substance, or other similar term, by any federal, state, or local environmental statute, regulation, or ordinance presently in effect or that may be promulgated in the future, as such statutes, regulations, and/or ordinances may be amended from time to time, provided that any amendment which adds any substance or material not currently defined as a Hazardous Substance shall not create any liability to Landlord or Tenant for knowledge or introduction of such substance or material prior to the effective date of the amendment.

6.2 Landlord's Obligations. Landlord agrees to indemnify, protect, defend and hold Tenant harmless from and against any and all claims, demands, damages, losses, liens, liabilities, penalties, (including without limitation reasonable attorney's fees at all trial and appellate levels), arising directly or indirectly from or out of, or in any way connected with: (a) the presence of any Hazardous Substances on or off the Leased Premises within the Landlord's Area if such presence is attributable to events which occurred prior to the Commencement Date; or (b) any violation or alleged violation of any Environmental Laws, attributable to events occurring before the execution of this Lease, unless such presence or violation was caused by a default by Tenant under this Article 6. Upon receipt of notice that the Premises or the Landlord's Area fails to comply with applicable Environmental Laws and such failure was not caused by a default by Tenant under this Article 6 and such failure is attributable to events which occurred prior to the Commencement Date, Landlord, at Landlord's sole cost and expense, shall perform or cause to be performed all remedial action necessary to cure such failure. In the event that the Premises or the Landlord's Area fails to comply with Environmental Laws and such failure was not caused by a default by Tenant under this Article 6 and such failure is attributable to events which occurred after the Commencement Date, either party may terminate this Lease by sixty (60) days prior written notice to the other party; provided, however, that in the event that the party who received such notice commences within said sixty (60) day period to perform such remedial action necessary to cure such failure and thereafter proceeds with due diligence to complete such remedial action, this Lease shall not terminate and shall continue in full force and effect. To the extent Tenant cannot utilize the Demised Premises due to the failure of the Premises or the Landlord's Area as set forth in this Article

6.2 to comply with Environmental Laws or the presence of Hazardous Substances or Petroleum Tanks or any necessary remedial action resulting therefrom, and such failure or presence was not caused by a default by Tenant under this Article 6, then the rent and all other payments due hereunder from Tenant to Landlord shall be abated prorata.

6.3 Tenant's Obligations. Tenant agrees that it will not (and it will take all steps necessary to assure that its employees, agents, invitees and licensees do not) maintain, carry, spill, release, discharge or dispose of any Hazardous Substances in, on, onto or into the Premises; provided only that, Tenant may carry and sell in the ordinary course of its business and in compliance with all applicable laws, regulations, ordinances and orders, Hazardous Substances that are pre-packaged when brought on the Premises and which are sold in those original packages to Tenant's customers. Tenant agrees to indemnify, protect, defend and hold Landlord harmless from and against any and all claims, damages, losses, liens, liabilities and penalties (including without limitation reasonable attorneys' fees/see below arising directly or indirectly from or out of any failure by Tenant to comply with its obligations contained in this Article 6. Tenant shall be solely responsible for any clean up, disposition or repair necessitated solely by Tenant's failure to comply with any applicable federal, state or local laws, regulations, ordinances or orders relating to the sale, storage, generation, use or disposal of Hazardous Substances.

INITIALS MG

6.4 Survival of Article. The terms of this Article 6 shall survive the termination of this Lease.

*at trial and appellate levels),

## ARTICLE SEVEN

## Use and Compliance with Laws, etc.

INITIALS

7.1 Permitted Use. (a) Landlord understands and agrees that Tenant will use the Premises for the retail sale of computer hardware, computer software, computer accessories, office products, office furniture and office machines and accessory type business supplies and related office services including copying and printing related services, manufacture and/or sale of promotional and directional signs, repair services for the types of products sold, and other products or services which are incidental or related to business or office use. Such use of the Premises shall not constitute a violation of or default under this Lease Agreement. Any other use of the Premises shall require the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

(b) Landlord hereby represents and warrants to Tenant that the use of the Premises for the purpose specified in the first sentence of Article 7.1(a) above shall not and does not conflict with the terms and conditions of any other existing leases or other agreements concerning the Landlord's Area and shall not and does not constitute a violation of the Easement.

7.2 Tenant's Compliance With Laws. Tenant shall, throughout the Demised Term, and at no expense whatsoever to Landlord, promptly comply, or cause compliance, with all federal, state, county and municipal governmental laws, ordinances, rules, and regulations which may be applicable to Tenant's use of the Demised Premises, including but not limited to the fixtures and equipment thereof. Subject to city restrictions, and subject to Landlord's approval (which approval shall not be unreasonably withheld or delayed) Tenant shall have the right to display Tenant's standard window lettering on the Premises.

7.3 Landlord's Compliance With Laws. Landlord shall comply with or cause compliance with such laws, ordinances, rules, and regulations affecting the Landlord's Area or structural portions of the Demised Premises if such compliance is not necessitated by Tenant's negligence or by Tenant's particular use or acts.

7.4 Condition of Demised Premises. Tenant has inspected the Demised Premises and hereby agrees to accept same in their "as is" condition on the Commencement Date unless specified elsewhere in this Lease, provided the Premises are then in substantially the same condition as on the date hereof except the Landlord's Work shall have been completed and Landlord shall have removed or cause to be removed all tenant fixtures and personal property belonging to the present tenant, if any, and shall deliver the Premises to Tenant vacant and broom clean.

7.5 Contest of Orders, Etc. Tenant, after notice to Landlord, may contest by appropriate legal proceedings, without cost or expense to Landlord, the validity of any law, ordinance, rule, or regulation of the nature referred to in this Article 7, provided, however, that (a) such contest shall not result in criminal responsibility on the part of Landlord, (b) Tenant shall diligently prosecute such contest to a final determination by a court, department or governmental authority or body having final jurisdiction, and (c) Tenant shall first satisfy Landlord concerning its financial ability to comply with such law, ordinance, order, rule, regulation or requirements, and (d) Tenant shall indemnify Landlord against any and all liability, loss and damage which Landlord may sustain by reason of Tenant's failure or delay in complying therewith. In any event, however, Tenant may not defer compliance if such deferment would constitute a violation of any of the provisions of any fee mortgage of which Tenant has actual knowledge and to which this Lease is now or hereafter becomes subordinate. Landlord agrees to cooperate reasonably with Tenant, and to execute any documents reasonably required for the purpose of any such contest, provided that the same shall be without cost or expense to Landlord. Landlord shall have the right, but not the obligation, to contest by appropriate legal proceedings, at Landlord's expense, any such law, ordinance, rule, regulation or requirement.

## ARTICLE EIGHT

### Utilities; Permits and Approvals

8.1 Utilities. Tenant agrees to pay or cause to be paid all charges for gas, water, electricity, or other utility service used, rendered or supplied to, upon or in connection with the Demised Premises throughout the Term, and to indemnify Landlord and save it harmless against any liability or damage on such account. Landlord has installed separate meters, at Landlord's expense, to measure Tenant's consumption of gas, water and electricity and other utilities, and Tenant shall keep them in good repair and replace them when necessary. Landlord represents that all of the above utilities are available to the Premises. Tenant's obligations under this Lease are expressly contingent upon the availability of adequate utilities to the Premises.

8.2 Permits and Approvals. Landlord acknowledges that Tenant's use of the Premises is conditioned upon Tenant receiving all permits, licenses, variances and approvals (collectively called the "Permits") necessary to construct Tenant improvements, to install Tenant's signage described in Article 36, and to operate Tenant's business in the Premises. Landlord agrees to cooperate with Tenant, and to execute any documents reasonably required for the purpose of obtaining the Permits, provided

that Tenant shall reimburse Landlord for any reasonable costs incurred by Landlord in cooperating with Tenant.

ARTICLE NINE

Maintenance and Repairs and Right of Inspection

9.1 Tenant's Maintenance and Repairs. Except for repairs and maintenance by Landlord under this Lease, Tenant shall, throughout the Term, at no expense whatsoever to Landlord, take good care of the Demised Premises, including, without limitation, the heating, ventilating and air conditioning equipment serving the Premises (except as otherwise provided in this Lease) and, shall not do or suffer any waste with respect thereto, reasonable wear and tear excepted, and Tenant shall promptly make all repairs necessary to keep the Premises in good and lawful order and condition. When used in this Article Nine, the term "repairs" shall include replacements, restoration and/or renewals when necessary. The provisions and conditions of Article Eleven applicable to changes or alterations shall similarly apply to repairs required to be done by Tenant under this Article. Except as otherwise provided in this Lease, nothing herein contained shall be construed to prevent Tenant or any licensee, sublessee, or other occupant claiming under or through Tenant from removing from the Premises trade fixtures, inventory, furniture, and equipment owned by Tenant or any licensee, sublessee or other occupant (other than Shopping Center equipment) on the condition, however, that Tenant shall, at its own cost and expense, and it hereby agrees to, repair any and all damages to the Premises resulting from or caused by the removal thereof.

9.2 Landlord's Maintenance and Repairs. Landlord shall, throughout the Term, at no expense whatsoever to Tenant, make all repairs to the roof, roof skin, utility lines outside of the Premises, structure of the exterior walls, floor slab and all structural repairs to the Premises. Further, Landlord shall make or cause to be made all repairs to all portions of the Landlord's Area other than the Premises if (i) such repairs are not necessitated by Tenant's negligence (except to the extent the same is covered or required hereunder to be covered by Landlord's fire and extended coverage insurance); and (ii) such repairs are necessary for the preservation of Tenant's property and safety of Tenant or its guests or invitees or profitable operation of Tenant's business.

9.3 Right to Inspect and Cure Defaults. Tenant shall permit Landlord and the authorized representatives of Landlord, after twenty-four (24) hours notice to Tenant, to enter the Premises at reasonable times during usual business hours for the purpose of (i) exhibiting or inspecting the same, (ii) curing any defaults on the part of Tenant in the making of any necessary repairs to the Premises which Tenant is obligated to make, (iii) providing access to all other portions of the Landlord's

Area not included in the Premises for the purpose of making inspections or necessary alterations if such access is not available through other channels, (iv) performing any work therein that may be necessary (whether it is Tenant's obligation in respect of which Tenant is in default or Landlord's obligation in respect of any part of the Landlord's Area not included in this demise) to comply with any laws, ordinances, rules, regulations or requirements of any public authority, or that may be necessary to prevent waste or deterioration in connection with the Premises or the Landlord's Area. No such work to cure any default of Tenant shall be started by Landlord except in an emergency unless said default of Tenant shall have continued beyond applicable notice and cure period in accordance with Article 16 of this Lease. The performance thereof by Landlord shall not constitute a waiver of the Tenant's default in failing to perform the same. Landlord shall, in connection with the doing of any such work, cause as little inconvenience, annoyance, disturbance, loss of business or other damage to Tenant or any such other occupant as may be reasonably possible in the circumstances, and, except in cases of emergency, Landlord shall use its best efforts not to conduct such work during Tenant's peak business hours.

## ARTICLE TEN

## Liens

10.1 Mechanics' Liens. Tenant shall not suffer or permit any liens to stand against the Premises or the Shopping Center or any part thereof by reason of any work, labor, services or materials done for, or supplied to (or claimed to have been done for, or supplied to), Tenant or anyone holding the Premises or any part thereof through or under Tenant. If any such lien shall at any time be filed against the Premises or the Shopping Center, Tenant shall cause the same to be discharged of record or bonded around within sixty (60) days after the date of filing of same, by either payment, deposit or bond. If Tenant shall fail to discharge any such lien or to post sufficient bond within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, procure the discharge of the same either by paying the amount claimed to be due, by deposit in court or bonding, and Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment, if any, in favor of the lienor with interest, cost and allowances. Any amount paid or deposited by Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of Landlord in defending any such action or procuring the discharge of such lien together with interest thereon at the annual rate of fourteen percent (14%) shall be deemed additional rent hereunder.

10.2 No Consent to Liens. Nothing in this Lease shall be deemed to be, or construed in any way as constituting, the consent or request of Landlord, expressed or implied, by inference or otherwise, to any person, firm or corporation for the performance of any labor or the furnishing of any materials for any construction, rebuilding, alteration or repair of or to the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials which might in any way give rise to the right to file any lien against Landlord's interest in the Premises. The foregoing is not intended to limit Tenant's right to contract for construction services or material relating to alterations or improvements otherwise permitted under this Lease. Landlord shall have the right to post and keep posted at all reasonable times on the Premises any

notices which Landlord shall be required to post for the protection of Landlord and the Premises from any such lien.

10.3 Security Interest in Fixtures Permitted. Tenant shall have the right at any time to grant a security interest in any goods and property of every type and description owned by Tenant and kept on the Leased Premises. Landlord hereby consents to any such security interest and hereby agrees that any interest of Landlord in any goods and property kept by Tenant on the Leased Premises including, without limitation, any statutory or contractual landlord's liens, shall be subordinate and inferior to such security interest. Landlord agrees that it will confirm the foregoing consent and subordination in writing upon request by Tenant or Tenant's lender. Notwithstanding any provision hereof to the contrary, Landlord hereby waives any interest, including without limitation, statutory and contractual landlord's liens, in Tenant's inventory, equipment and trade fixtures.

## ARTICLE ELEVEN

## Alterations

11.1 Alterations. During the Term of this Lease, Tenant may make alterations, additions and improvements to the Premises such as painting, removal and replacement of floor covering, ceiling modifications, relocation of non-loadbearing walls or partitions, or other simple modifications without the consent of Landlord.All other alterations, additions and improvements will require Landlord's approval, which approval shall not be unreasonably withheld or delayed.

11.2 Compliance with Laws. In connection with any alteration, addition, or improvement contemplated by this Article and any repairs or restoration work contemplated by the other terms and conditions of this Lease, Tenant shall comply with all applicable laws, regulations, ordinances and orders of any governmental body having jurisdiction and shall procure all requisite permits. Copies of all such approvals, authorizations, and permits within Tenant's possession shall, upon written request, be delivered to Landlord. Landlord will, upon written request from Tenant, execute any reasonable documents necessary to be signed on its part to obtain any such permit or approval, provided that Tenant shall reimburse Landlord for any reasonable expense incurred in connection therewith.

11.3 Property of Landlord. All such alterations, changes and additions made by Tenant (other than Tenant's trade fixtures, inventory and equipment) shall immediately be and become part of the real property and shall be surrendered with the Premises at the expiration or other termination of this Lease.

## ARTICLE TWELVE

## Insurance

12.1 Tenant's Insurance. During the Term of this Lease, Tenant shall, at its sole cost and expense, provide and maintain or cause to be provided and maintained with respect to the Demised Premises, commercial general public liability insurance protecting and indemnifying Landlord and Tenant against any and all claims resulting from bodily injury or property damage occurring upon, in or about the Demised Premises, including all elevators therein, such insurance to afford protection to the limits of not less than Two Million Dollars ($2,000,000.00) in respect of bodily injury or death of any one person and no less than Two Million Dollars ($2,000,000.00) for any property damage.

12.2 Landlord Insurance. During the Term of this Lease, Landlord shall, at its sole cost and expense, provide and maintain or cause to be provided and maintained with respect to the Demised Premises, insurance on the Landlord's Common Areas (hereinafter defined) and all the improvements in the Landlord's Area in which the Demised Premises are situated, except for the coverage provided for in Article 12.1 hereof. The Landlord covenants and agrees that any said insurance shall include protection against all the hazards and perils covered by the broad form Fire and Extended Coverage form of insurance policy and at Landlord's option, earthquake coverage, in effect in the state in which the Leased Premises are located, and shall be in amounts which, in the event of damage or destruction, will yield funds adequate to restore the said improvements to the condition existing immediately prior to any such damage or destruction. Landlord shall also obtain or cause to be obtained general commercial liability insurance at least equal to that set forth in Article 12.1 for all portions of the Landlord's Area including the Landlord's Common Area, indemnifying and holding harmless Tenant from any and all claims resulting from bodily injury or property damage occurring upon, in or about the Landlord's Common Areas, including but not limited to attorney's fees, whether suit be brought or not, including appeals, and Tenant shall pay its pro rata share of such liability insurance premiums as part of the common area maintenance expense described in Article 34 hereof. Tenant agrees to reimburse Landlord for all property insurance premiums duly paid by Landlord in accordance with this Lease for insurance against the perils covered by the broad form Fire and Extended Coverage Policy and earthquake coverage, if any, for the Demised Premises. Landlord shall furnish to Tenant a copy of the invoice for said insurance premiums at least thirty (30) days prior to the due date, and Tenant will pay to Landlord such insurance premiums within thirty (30) days of receipt of those materials. Tenant shall not be obligated to pay for any portion of any hazard or liability insurance which results in premiums that are in excess of normal premiums due to the rental of or use of any space in or portion of the Landlord's Area by any tenant or other party due to the unusual or hazardous nature of said tenant's or party's use or rental of any portion of the Shopping Center.

12.3 Policy Endorsement. Prior to the commencement of the Term of this Lease, Tenant and Landlord shall furnish the other party with certificates of insurance covering all insurance coverage required herein. All such certificates shall contain a provision that the insurance carrier shall not cancel or modify the insurance coverage without giving thirty (30) days' prior written notice thereof to both Landlord and Tenant. Current certificates of insurance shall be delivered to both Landlord and Tenant in time sufficient to assure that both Landlord and Tenant shall always possess certificates of insurance evidencing current insurance coverage.

12.4 Waiver of Subrogation. Landlord and Tenant hereby release each other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise, for any loss or damage to property caused by fire or any of the extended coverage casualties, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, provided however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder. Landlord and Tenant agree that they will request their

insurance carriers to include in all such policies such a clause or endorsement. If extra costs shall be charged therefor, each party shall advise the other of the amount of the extra costs, and the other party at its election may pay the same, but shall not be obligated to do so, and if it does not elect to pay the same, the other party need not obtain such waiver.

12.5 Insurance Hazard. Landlord or Tenant shall neither do nor suffer anything to be done whereby any of the insurance required by the provisions of this Article 12 shall or may be invalidated in whole or in part. Landlord shall not permit or suffer to be done in any part of the Shopping Center any activities which shall increase the rate of any insurance to be maintained by Landlord or Tenant over that rate normal and customary for Tenant's type of business (the "base rate"). Should such occur, Landlord shall pay all costs and expenses of such insurance over the base rate and Tenant shall have no obligation to contribute or pay any amounts in excess of its pro rata share of the base rate.

12.6 Insurance in General. Notwithstanding anything to the contrary hereinabove contained, the Tenant or Landlord may, at its option, include any of the insurance coverage hereinabove set forth in general, umbrella or blanket policies of insurance.

12.7 Insurance Proceeds. Tenant and Landlord shall cooperate with each other in connection with the collection of any insurance monies that may be due in the event of loss and Landlord shall execute and deliver to Tenant such proofs of loss and other instruments which may be required for the purpose of obtaining the recovery of any such insurance monies.

## ARTICLE THIRTEEN

## Casualty Damage

13.1 Casualty Damage. (a) If the Premises or any substantial portion of the Landlord's Area is damaged by fire or other insured casualty which is insured or should have been insured by Landlord under Article 12.2, Landlord shall proceed with reasonable diligence and at its sole cost and expense to repair and restore the Demised Premises and the Landlord's Area to the condition existing immediately prior to such damage. In the event the repair or restoration will require more than 12 months from the date of such damage, or if Landlord fails to commence rebuilding or repair within 90 days after the date of any casualty damage, then Tenant shall have the option to terminate this Lease effective as of the date of such damage by giving written notice of such termination to Landlord. For the purpose of this Article 13.1, Landlord shall be deemed to have commenced rebuilding or repair if Landlord has completed the architectural drawings and applied for permits to perform such rebuilding or repair. Landlord and Tenant shall each have the option to terminate this Lease upon thirty (30) days prior written notice to the other in the event the Demised Premises or a substantial portion of the Landlord's Area is substantially (over 25%) damaged by fire or other casualty which occurs in the last two (2) years of the Original Term or the last two (2) years of any option period unless Tenant exercises or has exercised its next available option, if any, to renew this Lease within said thirty (30) day period.

(b) In the event that neither Landlord nor Tenant elects to terminate this Lease as a result of damage caused by fire or other insured casualty which is insured or should have been insured by Landlord under Article 12.1, Tenant shall be entitled to a fair and reasonable abatement of Fixed Annual Net Rent and

other charges (including without limitation common area maintenance charges and other charges provided for herein) from the date of the occurrence of such fire or other casualty until the date on which any repairs or restoration are complete for such portion of the Premises which Tenant deems unusable.

(c) If the Demised Premises is damaged by an uninsured casualty, and provided that such casualty would not have otherwise been insured by an insurance policy properly maintained by Landlord under Article 12.1, Landlord may elect not to repair said damage and shall notify Tenant within thirty (30) days of said damage of that election. Within thirty (30) days of notification by Landlord to Tenant, Tenant or Landlord may terminate this Lease by serving notice on the other of termination and the Lease will be terminated thirty (30) days from said notification.

## ARTICLE FOURTEEN

## Condemnation

14.1 Termination of Lease on Taking. If at any time during the Term of this Lease, the whole of the Demised Premises shall be taken for any public or quasi-public use, under any statute, or by right of eminent domain, except as provided in Article 14.3, this Lease shall terminate on the date of such taking. If less than all of the Demised Premises shall be so taken and in the Tenant's reasonable opinion the remaining part is insufficient for the profitable conduct of the Tenant's business, or the Premises cannot be restored to such a condition to permit the profitable operation of Tenant's business within one hundred eighty (180) days of the taking, then Tenant may, by notice to the Landlord within sixty (60) days after notice of such taking, terminate this Lease. If less than the whole of the Shopping Center shall be taken in condemnation proceedings and (i) if so much of the Shopping Center shall be taken that the ratio of the parking area to floor area of all buildings in the Shopping Center is reduced, or (ii) if the loading area for the Demised Premises is taken unless an adequate substitute loading area is provided, or (iii) if any median cut, means of ingress or egress, traffic control device, traffic control device synchronization or turn lane on a road adjacent to or benefitting the Shopping Center is so altered without Tenant's consent, as to substantially and adversely affect the flow of traffic in, to, from or about the Demised Premises, Tenant may cancel this Lease by written notice to Landlord within sixty (60) days after possession shall be taken by the condemning authority or such alteration is effected. If the Tenant exercises its option to cancel or terminate this Lease, this Lease and the term hereof shall end on the date specified in the Tenant's notice and the Fixed Annual Net Rent and other charges shall be apportioned and paid to the date of such taking, no Fixed Annual Net Rent or other charges being payable thereafter.

14.2 Continuance of Lease on Taking. If less than all of the Demised Premises shall be taken and, in the Tenant's reasonable opinion communicated by notice to the Landlord within sixty (60) days after notice of such taking, the Tenant is able to gain access to and continue the profitable conduct of its business in the part not taken, this Lease shall remain unaffected, except that the Tenant shall be entitled to a pro rata abatement of Fixed Annual Net Rent and other charges hereunder based on the proportion which the area of the space so taken bears to the space demised hereunder immediately prior to such taking.

14.3 Temporary Taking. If the use and occupancy of in excess of twenty-five percent (25%) of the whole of the Demised Premises or the Landlord's Area is temporarily taken for a

public or quasi-public use for a period of more than one (1) year but less than the balance of the Term, at the Tenant's option to be exercised in writing and delivered to the Landlord not later than sixty (60) days after the date the Tenant is notified of such taking, this Lease and the term hereby granted shall terminate on the date specified in the Tenant's notice or if no notice is given, this Lease shall continue in full force and effect except that Tenant shall be entitled to a proportionate abatement of Fixed Annual Net Rent and other charges hereunder in the manner and to the extent provided in paragraph 14.2 or, at its option, shall receive that portion of the award for such taking which represents compensation for the value of the Tenant's leasehold estate and the Term demised hereunder, in which case the Tenant shall continue to pay in full the Fixed Annual Net Rent and other charges hereunder when due. If the Lease is terminated, Tenant shall be entitled to a fair reduction of Fixed Annual Net Rent and other charges during the period of partial taking and prior to the effective date of termination.

14.4 Compensation for Taking. Landlord and Tenant shall each be entitled to compensation, damages (including any severance damages), and interest, if any, for the appropriation of their rights and interest by the condemning authority. Each shall be entitled to receive that portion of the award as provided by the laws at the time of the award of the state in which the Shopping Center is located.

14.5 Continuance in Partial Taking. If there is a taking hereunder and this Lease is continued, Landlord shall, at its expense, proceed with reasonable diligence to repair, alter and restore the Demised Premises as a complete architectural unit of substantially the same proportionate usefulness, design and construction existing immediately prior to the date of taking, except that Landlord shall reconstruct the Premises in accordance with any modifications which are requested by Tenant and mutually agreed upon by Landlord and Tenant, provided that any excess construction cost caused by such modifications shall be paid by Tenant.

14.6 Definition of Condemnation. Taking by condemnation or eminent domain hereunder shall include the exercise of any similar governmental power and any sale, transfer or other disposition of the Demised Premises or the Shopping Center or land in lieu or under threat of condemnation.

## ARTICLE FIFTEEN

### Landlord's Right to Perform Tenant's Covenants

15.1 Landlord's Right to Perform. Tenant covenants and agrees that if it shall at any time fail to make any payment or perform any act which Tenant is obligated to make or perform under this Lease, then Landlord may, but shall not be obligated to do so, after Tenant's time to make any such payment or perform any such act as provided in Article Sixteen has expired, and without waiving or releasing Tenant from, any obligations of Tenant in this Lease contained, make any payment or perform any act which Tenant is obligated to perform under this Lease, in such manner and to such extent as shall be reasonably necessary, and in exercising any such rights, pay reasonably necessary and incidental costs and expenses, employ counsel and incur and pay reasonable attorneys' fees. Notwithstanding the foregoing, Landlord may make any such payment or perform any such act before Tenant's time to do so as provided in Article Sixteen has expired if the same is absolutely necessary or required for the

preservation or protection of the Premises or the Shopping Center. All sums so paid by Landlord and all reasonably necessary and incidental costs and expenses in connection with the performance of any such act by Landlord including reasonable legal fees, if any, together with interest thereon at the annual rate equal to fourteen percent (14%) from the date of the making of such expenditure by Landlord, shall be deemed additional rent hereunder and, except as otherwise in this Lease expressly provided, shall be payable to Landlord on demand or at the option of Landlord may be added to any rent then due or thereafter becoming due under this Lease, and Tenant covenants to pay any such sum or sums with interest as aforesaid and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the nonpayment thereof by Tenant as in the case of default by Tenant in the payment of the rent.

ARTICLE SIXTEEN

Default Provisions

16.1 Events of Default. Each of the following shall be deemed an event of default by Tenant and a breach of this Lease:

(a) (i) Filing of a petition by Tenant for adjudication as a bankrupt or for reorganization or for an arrangement under any federal or state statute, except in a Chapter 11 Bankruptcy where rent is being paid and the terms of the Lease are being complied with;

(ii) Involuntary dissolution or liquidation of Tenant;

(iii) Appointment of a permanent receiver or a permanent trustee of substantially all of the property of Tenant, if such appointment shall not be vacated within sixty (60) days;

(iv) Taking possession of the property of Tenant by any governmental officer or agency pursuant to statutory authority for dissolution, rehabilitation, reorganization or liquidation of the Tenant if such taking of possession shall not be vacated within one hundred twenty (120) days;

(v) Making by the Tenant of an assignment for the benefit of creditors;

(vi) In the event of a liquidation of Tenant's assets rather than a reorganization by Tenant under the Federal Bankruptcy Code, and further, in the event that Landlord consents, pursuant to Section 365 of the Federal Bankruptcy Code, to any assumption, assignment or sublease ("transfer") of the rights or interest of Tenant under this Lease, "adequate assurance of future performance" of this Lease by the transferee shall include, but not be limited to, establishment by the transferee of an impound account into which the transferee shall deposit the sum of all Fixed Annual Net Rent payable hereunder for the remaining portion of the Term then in effect, subject to withdrawal solely by Landlord from time to time as the same becomes due, the Fixed Annual Net Rent payable to Landlord under this Lease.

(b) If Tenant shall fail in making any payment of Fixed Annual Net Rent, or any part thereof, when the same shall become due and payable, and such failure shall continue for ten (10) days after written notice thereof is delivered from Landlord to Tenant; or

(c) If Tenant shall fail to pay any item of additional rent or any other charge required to be paid as set forth herein, and such failure shall continue for ten (10) days after written notice thereof is delivered from Landlord to Tenant; or

(d) If Tenant shall fail to perform or observe any other requirement of this Lease on the part of Tenant to be performed

or observed, and such failure shall continue for forty-five (45) days after written notice thereof is delivered from Landlord to Tenant; however, if the failure cannot with due diligence be cured prior to the expiration of the forty-five (45) days from the date of receipt of the notice provided for the above and Tenant commences within the forty-five (45) days after the date to eliminate the cause of such failure and proceeds diligently and with reasonable dispatch to take all steps and to do all the work required to cure such failure, then Tenant shall not be in default under this Lease.

16.2 Remedies for Lessee's Default. Upon the occurrence of any event of default set forth in this Lease and continuance thereof after giving of notice and expiration of applicable cure period, Lessor shall have the option to pursue any one or more of the following remedies without any notice or demand:

(a) Terminate this Lease, in which event Lessee shall immediately surrender the Leased Premises to Lessor, and if Lessee fails to surrender the Leased Premises, Lessor may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Leased Premises, by changing locks if necessary, and lock out, expel, or remove, in accordance with the law, Lessee and any other person who may be occupying all or any part of the Leased Premises, without being liable for prosecution of any claim for damages. This Lease and the Term hereof, as well as all of the right, title and interest of Tenant hereunder, shall wholly cease and expire in the same manner and with the same force and effect as if the date of expiration were the date originally specified herein for the expiration of this Lease and the Term, and Tenant shall then quit and surrender the Premises to Landlord; or

(b) Enter upon and take possession of the Leased Premises, by changing locks if necessary, and lock out, expel or remove, in accordance with the law, Lessee and any other person who may be occupying all or part of the Leased Premises, without being liable for any claim for damages, and relet the Leased Premises on behalf of Lessee and receive directly the rent by reason of the reletting. Landlord shall use its best efforts to relet the premises and obtain a reasonable rental rate. Lessee agrees to pay Lessor on demand any deficiency that may arise by reason of any reletting of the Leased Premises; further, Lessee agrees to reimburse Lessor on demand for any expenditures made by it for reasonable repairs in order to relet the Leased Premises; or

(c) Enter upon the Leased Premises, by changing locks if necessary, without being liable for prosecution of any claim for damages, and do whatever Lessee is obligated to do under the terms of this Lease. Lessee agrees to reimburse Lessor on demand for any reasonable expenses which Lessor may incur in effecting compliance with Lessee's obligations under this Lease; further, Lessee agrees that Lessor shall not be liable for any damages resulting to Lessee from effecting compliance with Lessee's obligations under the subparagraph unless caused by the negligence of Lessor; or

(d) Upon the occurrence of any event of default set forth in this Lease, Lessor may remove and store any property of Lessee that remains on the Premises. Lessor may store such property at any location satisfactory to Lessor. Lessor may dispose of such stored property after the expiration of fourteen (14) days from the date Tenant received notice that such property is so stored. Lessor shall deliver, by certified mail to Lessee at Lessee's last known address as shown by Lessor's records, a notice stating that Lessor may dispose of Lessee's property if Lessee does not claim the same within fourteen (14) days after Tenant receives notice that such property was stored.

16.3 Removal of Tenant. If this Lease shall be terminated as provided in the preceding Article 16.2(a) hereof, Landlord, or Landlord's agents or servants may immediately or at any time thereafter re-enter the Premises and remove therefrom Tenant, its agents, employees, servants, licensees, and any subtenants and other persons, firms or corporations, and all or any of its or their property therefrom, either by summary proceedings or by any suitable action or proceeding at law, and repossess and enjoy said Premises, together with all additions, alterations and improvements thereto (excepting Tenant's trade fixtures, inventory and equipment which may be removed by Landlord in accordance with Article 16.2(d) above).

16.4 Re-Entry by Landlord. In case this Lease shall be terminated as hereinbefore provided, or by legal proceedings, or in the event of a default which entitles Landlord to retake possession of the Demised Premises for the account of Tenant as provided herein Landlord or its agents may, immediately or any time thereafter, re-enter and resume possession of the Demised Premises or such part thereof, and remove all persons and property therefrom, by a suitable action or proceeding at law. No re-entry by Landlord shall be deemed an acceptance of or a surrender of this Lease.

16.5 Default by Landlord. In the event Landlord fails to perform any of its obligations under this Lease Agreement, Tenant agrees that Landlord shall not be in default and Tenant will not pursue any remedy available to it until forty-five (45) days after written notice by Tenant to Landlord and to any lender holding a first deed of trust lien against the Landlord's interest in the Premises (provided Tenant has received prior written notice of the name and address of such lender); however, if the failure cannot be cured with due diligence prior to the expiration of forty-five (45) days from the date of receipt of the notice and Landlord commences within such forty-five (45) day period to cure the failure and proceeds diligently and with reasonable dispatch to cure the failure, then Landlord shall not be in default under this Lease. In addition to any and all remedies that may be available to Tenant at law or in equity, Tenant shall have the right and option, from and after the expiration of such forty-five (45) day period (as such period may be extended hereunder), to terminate the Lease or cure any default by Landlord and expend any sums Tenant deems necessary or desirable to effect such cure, and Landlord shall upon demand reimburse Tenant for the cost thereof. If Tenant elects to cure a default by Landlord, Tenant shall do so in accordance with Article 16.6 below.

16.6 Curing of Defaults. If Landlord or Tenant shall default in the performance or observance of any covenant or condition herein contained on either Landlord's or Tenant's part to be performed or observed for more than the applicable grace period, the other party may, on reasonable notice, but at least ten (10) days prior notice in writing to the defaulting party, or without such notice if an emergency shall exist, perform the same for the account and at the expense of the other, and the expense of doing so, together with interest thereon at the rate of fourteen percent (14%) per annum from the date of the advance therefor shall be due and payable upon demand. If Landlord or Tenant shall incur any expense, including reasonable attorneys' fees, in instituting, prosecuting or defending any action or proceedings instituted by reason of default by the other, the defaulting party shall reimburse the other for the amount of such expense. The Tenant may, at its option, deduct sums or any part thereof expended by Tenant pursuant to this Article 16.6 from Fixed Annual Net Rent or any other sums then or thereafter due to Landlord hereunder.

16.7 Rent Default Payment. Rent is due on the first day of each calendar month. If rent is not received by the tenth (10th) day of the month, then beginning on the tenth (10th) day of said month, liquidated damages will begin accruing. If default shall at any time be made by Tenant in the payment of rent, or any other obligation entered into under the terms of this Lease for the payment of monies, or any installment thereof, then Tenant shall pay to the Landlord as liquidated damages and not as a penalty, in addition to all other rents and remedies provided herein, an amount equal to five percent (5%) of the monthly minimum rent as set out above and in addition to said damages, interest shall accrue on any rent and liquidated damages unpaid at the rate of fourteen percent (14%) per annum until rent, damages and said interest are paid in total. Nothing herein, however, shall be construed as setting aside Landlord's right of re-entry and/or other rights and remedies set out herein.

## ARTICLE SEVENTEEN

## Waiver

17.1 Non-Waiver. The failure of Landlord or Tenant to insist in any one or more cases upon the strict performance of any of the terms, covenants, conditions, provisions or agreements of this Lease or to exercise any option herein contained shall not be construed as a waiver or a relinquishment for the future of any such term, covenant, condition, provision, agreement or option. A receipt and acceptance by Landlord of Fixed Annual Net Rent or any other payment, or the acceptance of performance of anything required by this Lease to be performed, with knowledge of the breach of any term, covenant, condition, provision or agreement of this Lease, shall not be deemed a waiver of such breach, nor shall any such acceptance of Fixed Annual Rent in a lesser amount than is herein provided for operate or be construed either as an accord and satisfaction or in any manner other than as a payment on account of the earliest rent then unpaid by Tenant, and no waiver by Landlord or Tenant of any term, covenant, condition, provision or agreement of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord or Tenant, whichever the case may be.

17.2 Injunction. In addition to the remedies in this Lease provided, Landlord and Tenant shall each be entitled to the restraint by injunction of any violation or attempted or threatened violation, of any of the terms, covenants, conditions, provisions or agreements of this Lease.

## ARTICLE EIGHTEEN

## Quiet Enjoyment

18.1 Quiet Enjoyment. Landlord covenants and agrees that Tenant, upon paying the rent and all other charges herein provided for and performing and observing the covenants, conditions and agreements hereof upon the part of Tenant to be performed and observed, may peaceably hold and enjoy the Premises during the Term hereof.

## ARTICLE NINETEEN

## Surrender of Premises

19.1 Surrender of Premises. Tenant shall, upon the expiration or termination of this Lease for any reason whatsoever, surrender to Landlord the building, structures and plumbing,

heating, ventilation and air conditioning systems then upon the Premises, together with all alterations and replacements thereof then on the Premises, in good order, condition and repair, except for reasonable wear and tear and damage from fire or other casualty or other cause beyond Tenant's reasonable control. Title to all of Tenant's trade fixtures, furniture, inventory and equipment installed in the Premises shall remain in Tenant, and, upon expiration or other termination of this Lease, the same may require removal and, upon the demand of Landlord, shall be removed and any resultant damage to the Premises shall be repaired by and at the expense of Tenant.

## ARTICLE TWENTY

## Assignment, Subletting

20.1 Assignment. Tenant shall have the right to assign this Lease or let or underlet the whole or any part of the Leased Premises with the consent of the Landlord, which consent shall not be unreasonably withheld or delayed. Notwithstanding any such assignment or subletting Tenant shall remain liable on this Lease. The use of the assignee or subtenant must comply with Article 7.1(a).

20.2 Assignment Within. Notwithstanding the foregoing, Tenant may without Landlord's consent at any time assign this Lease or let or underlet the whole or any part of the Premises to any licensee, franchisee, third party management company, affiliate, parent or wholly owned subsidiary of Tenant or to any corporation resulting from the consolidation or merger of Tenant into or with such other corporation, provided such assignment or subletting is for a use which complies with Article 7.1(a). Notwithstanding any assignment or sublease under the provisions of this paragraph 20.2, Tenant shall remain fully liable on this Lease.

## ARTICLE TWENTY-ONE

## Approvals and Consents

21.1 Approvals and Consents. Except as otherwise specifically provided herein, whenever this Lease grants or reserves to Landlord or Tenant the right to approve or consent to any action or inaction by the other party, such approval or consent shall not be unreasonably withheld or delayed. If the party whose approval or consent is requested shall fail to advise the requesting party that the requested approvals or consents submitted to the party whose approval or consent is requested are approved, disapproved, consented to or not consented to within ten (10) days (or such other period as may be specifically provided herein for the granting or withholding of such consent or approval) after receipt of such by the party whose approval or consent is requested, and the requesting party has provided to the party whose approval or consent is requested a second notice of ten (10) days requesting such approval or consent and informing the party whose approval or consent is requested that its failure to respond within such ten (10) day period shall be deemed its approval or consent to such requested action or inaction by the requesting party, the failure of the party whose approval or consent is requested to respond within such second ten (10) day period shall be deemed to be the approval by the party whose approval or consent is requested of such action or inaction by the requesting party.

ARTICLE TWENTY-TWO

Estoppel Certificate

22.1 Estoppel Certificate. At any time and from time to time upon the written request of either of the parties hereto or any mortgage lender of Landlord or Tenant, Landlord or Tenant, as the case may be, shall deliver to the party requesting the same a certificate executed in recordable form stating (i) whether or not this Lease is in full force and effect, (ii) whether or not any rights to renew the term of this Lease have been exercised and the date on which this Lease will terminate, (iii) whether or not this Lease has been modified or amended in any way and attaching a copy of such modification or amendment, (iv) whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any, (v) the status of rent payments and (vi) any other facts regarding the operation of the Lease which the mortgage lender may reasonably request.

ARTICLE TWENTY-THREE

Invalidity of Particular Provision

23.1 Invalidity of Particular Provision. If any term or provision of this Lease or the application thereof to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provisions to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

ARTICLE TWENTY-FOUR

Subordination and Non-Disturbance

24.1 Future Mortgages/Deeds of Trust. This Lease shall be subject and subordinate to the lien of any mortgage and/or deed of trust which Lessor may hereafter place upon the premises provided that (1) if there are no defaults hereunder on the part of Tenant the right of possession of Tenant to the Leased Premises and Tenant's rights arising out of this Lease shall not be affected or disturbed by the mortgagee or trustee or beneficiary under the mortgage and/or deed of trust in the exercise of any of its rights under the mortgage, deed of trust or the notes secured thereby; (2) Tenant shall not in any foreclosure or other proceeding under the mortgage or deed of trust nor in any other way be deprived of its rights under this Lease, nor shall this Lease be terminated or affected by any foreclosure or sale or any proceeding under any mortgage or deed of trust; and (3) the mortgagee, trustee and/or beneficiary shall execute and deliver to Tenant an Agreement of Attornment and Non-Disturbance in the form which is in substantial conformance with that which is attached hereto as Exhibit "E" or such other form as may be reasonably acceptable to Tenant and such mortgagee, trustee and/or beneficiary prior to the execution of the mortgage or deed of trust. Lessor agrees that in the event of any foreclosure of the mortgage or deed of trust, Tenant shall have the right to withhold the payment of any rentals due hereunder and pay the same directly to the mortgagee or trustee in satisfaction of said indebtedness.

24.2 Presently Existing Mortgages/Deeds of Trust. Landlord hereby warrants and represents to Tenant as a condition to

Tenant's obligations under this Lease that there are no ground leases, mortgages, deeds of trust or other liens upon or affecting the Demised Premises as of the effective date of this Lease.

## ARTICLE TWENTY-FIVE

### Security

25.1 Security. Tenant at Tenant's expense, shall have the right to employ such reasonable security measures as Tenant, in its sole discretion, deems appropriate, including without limitation the installation of burglar bars or other security devices in or upon the Premises.

## ARTICLE TWENTY-SIX

### Notices

26.1 Notices. All notices, demands and requests which are required or desired to be given by either party to the other shall be in writing. All notices, demands and requests by either party to the other shall be sent by private courier (i.e., Federal Express) or United States registered or certified mail, postage prepaid, addressed to the other party at its address set forth in this Lease, or at such other place as it may from time to time designate in a written notice to the other party received by such party at least five (5) days prior to the effective date of such address change, with copies thereof by registered or certified mail, addressed to Tenant, at 2000 E. Lamar Blvd., Suite 700, Arlington, Texas 76006, with a copy to Tenant's Real Estate Department at the same address and a copy to any assignee or subtenant of which Landlord has received written notice of its name and address and to Landlord at 301 Jefferson Street, Oakland, California 94607. Notices, demands and requests which are served upon Landlord or Tenant in the manner aforesaid, shall be deemed to have been "given" as of the time said notice, demand or request is picked up by private courier or is deposited in the U.S. Mail, and shall be deemed "delivered" or "received" or words of similar import upon receipt by the party or party's agent intended to be given said notice, demand or request.

## ARTICLE TWENTY-SEVEN

### Miscellaneous

27.1 Captions. The captions of this Lease are for convenience and reference only, and in no way define, limit or describe the scope of intent of this Lease nor in any way affect this Lease.

27.2 Business Day. Whenever a specific date mentioned in this Lease is not a business day, then it shall be taken to mean the next business day. The term "business day" shall mean Monday through Friday except for legal holidays recognized in the state in which the Premises are located.

27.3 Survival of Liability. All of Landlord's and Tenant's covenants and agreements contained in this Lease shall survive the expiration or earlier termination of this Lease, unless the context thereof shall require another meaning.

27.4 Rent Abatement. In the event that the Lease Agreement provides for the abatement or waiver of any rent, such abatement or waiver of rent shall include without limitation the abatement and waiver of Fixed Annual Net Rent, common area maintenance

charges, taxes, insurance, and any and all other charges imposed upon Tenant under the Lease Agreement during and for the period of such rent abatement or waiver.

27.5 "Landlord". The term "Landlord" as used in this Lease means only the owner or the mortgagee in possession for the time being of the Premises, so that in the event of any sale of the Premises, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder, and it shall be deemed and construed without further agreement between the parties and the purchaser, that the purchaser has assumed and agreed to carry out all of the covenants and obligations of Landlord hereunder.

27.6 Pro Rata Share. It is acknowledged that real property taxes and fire and extended coverage insurance for the Demised Premises are separately assessed or billed so that Tenant's pro rata share will apply only with respect to the Common Area. Unless separately assessed or expressly stated to the contrary in this Lease, Tenant's pro rata share shall be calculated as set forth in the Bylaws of the Concord Shopping Center Owners' Association (the "Bylaws") which are attached hereto as Exhibit "F" and made a part hereof and shall be equal to the amount charged to Landlord under said Bylaws. Notwithstanding any provision of this Lease to the contrary, in the event that any additional buildings are constructed on the Landlord's Area or if there are otherwise any other tenants or occupants of Landlord's Area (other than assignees or subtenants of Tenant hereunder), Tenant's responsibility under this Lease for the payment of real property taxes on Landlord's Area, insurance maintained by Landlord, and Common Area maintenance expense incurred by Landlord shall be based upon Tenant's pro rata share of such costs, calculated as a fraction, the numerator of which shall be the gross leasable area within the Demised Premises and the denominator of which shall be the gross leasable area contained in all buildings within the Landlord's Area.

27.7 Gross Leasable Area. "Gross leasable area" shall mean the square footage of floor area of an entire structure or a part of a structure or structures and all component parts thereof, measured to and from the centerline of demising walls and the outside of exterior walls provided. In computing gross leasable area there shall be no exclusion by interior partitions or other interior construction or equipment. For the purpose of computing Tenant's pro rata share, gross leasable area shall not include any portion of the Common Area of the Shopping Center.

27.8 Interest. Whenever this Lease provides for interest upon an amount such interest shall commence to accrue upon the date that the amount in question became due and shall continue upon the unpaid balance of said amount from time to time remaining until paid. In the event that this Lease provides for interest at the highest rate allowed by law and no such rate is established by applicable law, the interest rate shall be deemed to be fourteen percent (14%) per annum. It is the intention of Landlord and Tenant to comply with all applicable usury laws. No provision of this Lease shall authorize the collection of interest in excess of the highest rate allowed by law. If, from any circumstance whatsoever, interest would otherwise be payable under this Lease in excess of the maximum lawful rate, the interest and any such other compensation payable or paid shall be reduced to the maximum lawful rate; and if from any circumstance either party shall ever receive interest or anything of value deemed interest by applicable law in excess of the maximum lawful rate, an amount equal to any such excessive interest shall be applied to the reduction of the principal of any amounts owed and not to the payment of interest, or if such

excessive interest exceeds the unpaid balance of principal of any amounts owed under this Lease, such excess shall be refunded to the party that paid such excess.

27.9  Guaranty.  The execution and delivery by Intelligent Electronics, Inc. of a guaranty of the performance of the obligations of Tenant under this Lease in the form attached hereto as Exhibit "J" and made a part hereof shall be a condition precedent to the effectiveness of this lease.

## ARTICLE TWENTY-EIGHT

### Recording Lease

28.1  Recording Lease.  Lessor agrees that upon request from Tenant and prior to the Commencement Date or at any time as Tenant desires, Lessor will promptly execute and deliver to Tenant a memorandum or short form lease (hereinafter "Memorandum of Lease") in the form attached hereto as Exhibit "G" and made a part hereof, to be recorded in the public office in which records relating to the Leased Premises are kept and take such other and further action as may be necessary to give all persons now or hereafter interested in title to the Leased Premises notice of the existence of this Lease, including such terms and provisions as Tenant deems appropriate, provided, however, that unless specifically requested by Tenant or Landlord and consented to by Tenant and Landlord, no copy of this Lease or other instrument shall be filed for record which sets forth the rental provisions contained herein.  Specifically, the Lessor agrees to execute such further documentation which may be required to insure that the renewal rights granted hereunder are recorded on title.

## ARTICLE TWENTY-NINE

### Entire Agreement

29.1  Entire Agreement.  This instrument constitutes the entire agreement between the parties and there are no verbal or collateral understandings, agreements, representations or warranties not expressly set forth herein.  No change, amendment or addition to this Lease shall be effective unless in writing and signed by both parties.

## ARTICLE THIRTY

### Covenants Binding on Respective Parties

30.1  Covenants Bindings on Respective Parties.  Except as otherwise expressly provided in this Lease, the terms, conditions, covenants, provisions and undertakings herein contained shall be binding upon and inure to the benefit of each of the parties hereto and their heirs, personal representatives, legal representatives, successors and assigns and shall run with the land.

## ARTICLE THIRTY-ONE

### Broker

31.1  Broker.  Landlord and Tenant each represent to the other that The Colfax Group and Contra Costa Properties were the brokers who brought about this Lease, and that no other broker or person was in any way instrumental or had any part in bringing about this transaction.  Landlord represents and warrants that all brokerage charges payable to The Colfax Group and to Contra Costa Properties in connection with this Lease shall be

paid by Landlord. Landlord and Tenant shall each indemnify and hold harmless the other from and against any and all claims, liabilities, costs or expenses, including reasonable attorneys' fees, in connection with any claims made for commissions or fees by any other broker or person, arising by, through or on account of any act of such party or its representatives. The provisions of this Article Thirty-One shall not be deemed or construed as a covenant for the benefit of any third party.

## ARTICLE THIRTY-TWO

### Law of State

32.1 Law of State. This agreement shall be governed by and construed in accordance with the laws of the State of California and the venue for any actions arising hereunder shall be Contra Costa County, California.

## ARTICLE THIRTY-THREE

### Holding Over

33.1 Holding Over. Any holding over after the expiration of the Term of this Lease, with the consent of Landlord, shall be construed to be a tenancy from month-to-month, cancellable upon thirty (30) days written notice, and at a rental and upon the terms and conditions of this Lease, except that, at Landlord's option, the Fixed Annual Net Rent shall be one hundred twenty percent (120%) of that amount called for in the last year of the Term hereof. The foregoing notwithstanding, should Tenant hold over, without the consent of Landlord all provisions of this Lease for payments to Landlord shall be increased by one hundred percent (100%).

## ARTICLE THIRTY-FOUR

### Common Areas

34.1 Definition. The term "Common Area" is defined for all purposes of this Lease as that part of the Shopping Center intended for the common use of all tenants, including among other facilities (as such may be applicable to the Shopping Center), parking areas, private streets and alleys, landscaping and landscaped areas, curbs, loading area, sidewalks, malls and promenades (enclosed or otherwise), lighting facilities, drinking fountains, meeting rooms, public toilets, and the like, but excluding (i) space in buildings (now or hereafter existing) designated for rental for commercial purposes, as the same may exist from time to time, and the roof, exterior walls and structural portions of such buildings, and (ii) easements, streets and alleys maintained by a public authority. The term "Landlord's Common Area" is defined for all purposes of this Lease as that portion of the Common Area that is located within Landlord's Area. Landlord's rights in and to that portion of the Common Area that is within the Other Portion are created pursuant to the terms of the Easement. Landlord agrees to use reasonable efforts and due diligence to protect any and all rights and to enforce any and all remedies of Landlord provided by the Easement. Landlord reserves the right to change from time to time the dimensions and location of the Landlord's Common Area as well as the dimensions, identity and type of any buildings in the Landlord's Area; provided that such change does not or will not have a material adverse effect on the visibility or accessibility of the Demised Premises and will not adversely affect Tenant's parking requirements. Landlord agrees that without the prior written consent of Tenant, the following shall not be allowed to operate in the Landlord's Common Area: traveling

carnivals, fairs, auctions, shows, Kiosks, sales by transient merchants utilizing vehicles or booths or other promotions of any nature.

34.2 Tenant's Right to Use. Tenant, and its employees, customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the nonexclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord and other tenants in the Shopping Center.

34.3 Maintenance of Common Area. The Landlord agrees to operate and maintain, or cause the operation and maintenance of the Common Area in a manner commensurate with the highest standards of regional shopping center maintenance, and provide (or cause to be provided) maintenance provisions therefor all such services as are reasonably required, including without limitation, cleaning and sweeping, snow and ice removal, if applicable, lighting, policing if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, landscaping and complete maintenance thereof, and liability insurance pertaining to the Common Area.

34.4 Maintenance Expenses and Related Obligations. The Landlord shall keep or cause to be kept the Common Area in a neat, clean and orderly condition, properly lighted and landscaped and shall repair any damage to the facilities thereof, but all expenses in connection with the maintenance and repair of the Common Area shall be charged and prorated in the manner hereinafter set forth. It is understood and agreed that the phrase "expenses in connection with the maintenance and repair of the Common Area" as used herein shall be construed to include, but not be limited to, all sums expended by Landlord under the Easement and the Bylaws in connection with the maintenance and repair of the Common Area for all general maintenance and repairs; resurfacing of the parking area (but not more than once in any five year period during the Term), painting, restriping, cleaning, sweeping and janitorial services; planting and landscaping; lighting and other utilities; directional signs and other markers and bumpers; exterior building painting; personnel to implement such services and to police the automobile parking and Common Area; real and personal property taxes and assessments thereon; public liability and property damage insurance on the Common Area (which shall be carried and maintained by Landlord as provided in Article 12) and a reasonable allowance to Landlord for Landlord's supervision and property management of the Common Area; provided that such allowance or management fee shall not exceed ten percent (10%) of the total Common Area maintenance expenses in which Tenant is obligated to participate (specifically excluding from such calculation any amounts for real property taxes or insurance on the Common Area). Expenses in connection with the maintenance and repair of the Common Area shall not include the cost of capital repairs, capital expenditures, improvements, additions or replacements which would constitute capital expenses under generally accepted accounting principles, except that Tenant shall participate in the cost of resurfacing the parking area not more than once in any five (5) year period during the Term. Landlord may, however, cause any or all of said services to be provided by an independent contractor or contractors.

34.5 Payment by Tenant. Landlord agrees to furnish to Tenant a statement setting forth the total expenses for the Common Area for each calendar year, said statement to be furnished to Tenant at least thirty (30) days prior to the beginning of each calendar year. Tenant agrees to pay to Landlord, Tenant's pro rata share of such expenses in twelve (12) monthly

installments as monthly rent for the use of the Common Area. Tenant's pro rata share of the total expenses for each lease year shall be that portion of all such expenses which is equal to the proportion thereof which the number of square feet of ground floor area in the Demised Premises bears to the total number of square feet of floor area of the building which the Demised Premises are located. There shall be appropriate adjustment of Tenant's share of the Common Area expenses as of the commencement and expiration of the Term of this Lease. For clarification, it is acknowledged that Tenant's pro rata share of costs for Common Area maintenance shall be 100% of the costs incurred by Landlord for Common Area maintenance. The Landlord covenants and agrees to present to the Tenant an annual statement showing an itemization of said costs and expenses and shall, upon written request of the Tenant, furnish to Tenant certified copies of any bills and expenses, and evidence reasonably satisfactory to Tenant that said bills have been paid by Landlord. The Tenant and Landlord covenant and agree to readjust all sums due to the Landlord or Tenant, as the case may be hereunder within fifteen (15) days after receipt from the Landlord of said statement, and any requested bills and evidence of payment of same for each calendar year.

If Tenant is not satisfied with the statement, copies of paid bills and other evidence of payment furnished by Landlord, or wishes to challenge the reasonableness of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled to an audit of Landlord's books to be made by accountants reasonably acceptable to both parties. If such audit shows that any statement rendered by Landlord is overstated by more than three percent (3%), Landlord shall pay to Tenant the cost of such audit.

34.6 <u>Rules and Regulations and Tenant Association</u>. Tenant, in the use of the Common Area, agrees to comply with the Rules and Regulations which are attached hereto as Exhibit "H" and made a part hereof. Landlord agrees that the Rules and Regulations shall be nondiscriminatory and shall be equally applicable to and enforced against all tenants. Landlord or a committee of tenants of the Shopping Center may, from time to time, adopt amendments or additions to the Rules and Regulations, provided that no such amendment or addition shall materially and adversely affect the operation of Tenant's business at the Premises, and further provided that no such amendment or addition shall be effective until the expiration of ten (10) days after written notice thereof has been delivered to Tenant. Tenant agrees to maintain a membership in the Association authorized and recognized by Landlord and established by the tenants of the Shopping Center. Tenant also agrees to pay promptly when due, Tenant's share of such assessments as may be fixed by or from time to time by the same association for the purpose of creating and maintaining a fund for the general promotion of the Shopping Center as a whole; provided that in no event shall Tenant's share of any such assessments exceed $1,500 per Lease Year.

## ARTICLE THIRTY-FIVE

## Parking and Required Access

35.1 <u>Parking</u>. Tenant's parking rights granted under this Lease shall be subject to the terms of the Easement and Tenant shall be entitled to the rights and privileges of Landlord under the Easement. Landlord shall perform all of its obligations under the Easement and shall use its best efforts and due diligence to protect and enforce all rights and remedies of Landlord under the Easement.

35.2 Required Access and Parking. Access, curb cuts and the parking lot within Landlord's Area shall be provided by Landlord as outlined on Exhibit "A." Notwithstanding any provision of this Lease to the contrary, if access and curb cuts from any present roadway as compared with same as outlined on Exhibit "A" is diminished, reduced or otherwise modified as to materially and substantially affect Tenant's use and enjoyment of the Premises, or if the parking lot within Landlord's Area as reflected on said Exhibit "A" is no longer part of the Shopping Center or available for the use and enjoyment of Tenant, its employees, invitees, customers, etc., on a regular and normal basis, then Tenant shall have the absolute right to terminate this Lease upon giving no less than forty-five (45) days' prior written notice to Landlord, provided however, that this Lease shall not terminate if Landlord shall commence within forty-five (45) days after receipt of written notice from Tenant and proceed with all due diligence and with reasonable dispatch to take all steps and to do all work required to provide alternative access, curb cuts and the same numbers of parking spaces as are in the parking lot within Landlord's Area that are contiguous and reasonably accessible to the Premises and do not substantially and materially affect Tenant's use and enjoyment of the Premises. In an event of termination, each party shall be relieved of all further obligations hereunder and any prepaid rent or security deposits or like sum shall be returned to Tenant post haste.

35.3 Loading Area. Tenant reserves the non-exclusive right to access the loading area at all times, subject to the Easement.

## ARTICLE THIRTY-SIX

### Signage

36.1 Facia Signage. Landlord will allow, at Tenant's sole cost and expense, exterior signage to be located on the facia area of the store front to the Premises in Tenant's logo and colors at the maximum square footage and height, subject to compliance with code (or a properly obtained variance thereto) and by the current sign approval procedure which is applicable to the Shopping Center, which sign approval procedure is more particularly described on Exhibit "I" attached hereto and made a part hereof. Notwithstanding any provision hereof to the contrary, Landlord hereby approves Tenant's signage as described on Exhibit "I-1" attached hereto and made a part hereof. Any other building signage shall require Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed. The sign approval procedure may be amended from time to time provided that such amendments shall not: (i) be effective as to existing signage but shall apply only in the event that Tenant desires to change its signage after the effective date of the amendment; (ii) materially and adversely affect the operation of Tenant's business at the Demised Premises; (iii) be effective until the expiration of ten (10) days after written notice thereof is given to Tenant; and (iv) be discriminatory but shall be equally applicable to and enforced against all tenants of the Shopping Center.

36.2 Pylon/Monument Signage. Tenant acknowledges that pylon/monument signs are currently not permitted in the Shopping Center. If, in the future, the Shopping Center has any pylon/monument signs in which other major tenants of the Shopping Center are participating, or if pylon/monument signs are generally permitted for the Shopping Center as a whole, then Tenant, subject to the sign approval procedure described on Exhibit "I" attached hereto, shall be allowed to install its pylon/monument sign in accordance with local ordinances or a

properly obtained variance thereto. It is understood and agreed that the signage so provided shall, subject to the sign approval procedure described on Exhibit "I" attached hereto, be in the form of Tenant's standard logo and colors at the maximum height and square footage in accordance with local ordinances or a properly obtained variance thereto.

## ARTICLE THIRTY-SEVEN

### Termination Privilege

37.1 Landlord. In the event Tenant is paying all rents and complying with all other terms, conditions and provisions of this Lease, but Tenant has vacated the Premises other than as a result of a casualty, condemnation, remodeling (up to 180 days per Lease Year) force majeure or an assignment or subletting which has been approved by Landlord, Landlord's only remedy in such event will be to terminate this Lease in accordance with this Article and release Tenant from all obligations and liabilities of this Lease. Landlord may terminate this Lease pursuant to this Article only by giving Tenant written notice of such termination, upon the earlier to occur of (A) sixty (60) days after Tenant gives Landlord written notice of Tenant's intent to vacate the Premises or (B) the expiration of one hundred eighty (180) consecutive days after Tenant has vacated the Premises (except as a result of the reasons set forth above). Landlord may not exercise its right to terminate under this Article during the pendency of a proposal for assignment or subletting subject to Article 20.

## ARTICLE THIRTY-EIGHT

### Time is of the Essence

38.1 Time is of the Essence. In the event that Landlord does not accept this Lease by executing a copy hereof and delivering the same to Tenant on or before 12:00 noon on December 30, 1991, then in that event this Lease shall be null and void and shall have no force or effect.

## ARTICLE THIRTY-NINE

### Effective Date of Lease

39.1 Effective Date of Lease. The effective date of this Lease shall be considered to be the date of the last execution hereof.

## ARTICLE FORTY

### Schedule of Exhibits

40.1 Schedule of Exhibits. The following is a schedule of Exhibits which are attached to this Lease and incorporated herein by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan of Shopping Center |
| Exhibit "B" | - | Legal Description of Landlord's Area |
| Exhibit "C" | - | Copy of Easement |
| Exhibit "D" | - | Description of Landlord's Work |
| Exhibit "E" | - | Form of Attornment and Non-Disturbance Agreement |
| Exhibit "F" | - | Copy of Bylaws |
| Exhibit "G" | - | Form of Memorandum of Lease |
| Exhibit "H" | - | Rules and Regulations |
| Exhibit "I" | - | Sign Approval Procedure |
| Exhibit "I-1" | - | Tenant's Signage |
| Exhibit "J" | - | Form of Guaranty |

**WITNESSES:**

("Landlord")

By: [signature]

[signature: Murray Gordon Trustee]
MURRAY GORDON, as Co-Trustee of the Murray and Janet Gordon Family Trust
Date: 12/27/91
by Richard Arnold his atty in fact

By: [signature]

[signature: Janet Gordon Trustee]
JANET GORDON, as Co-Trustee of the Murray and Janet Gordon Family Trust
Date: 12/27/91
by Richard Arnold her atty in fact

By: [signature]

[signature: Richard Arnold Trustee]
RICHARD ARNOLD, as Co-Trustee of the Richard and Lois Arnold Family Trust
Date: 12/27/91

By: [signature]

[signature: Lois Arnold Trustee]
LOIS ARNOLD, as Co-Trustee of the Richard and Lois Arnold Family Trust
Date: 12/27/91

("Tenant")

BIZMART, INC., a Delaware corporation

By: ______________________

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

BIZ/313

300657

SUM-100

# SUMMONS
# (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED

2008 FEB 19 A 11: 16

K. TORRE CLERK OF THE SUPERIOR COURT COUNTY OF CONTRA COSTA, CALIF.

BY D. Wagner, Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
Officemax, Inc., Does 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTA DEMANDANDO EL DEMANDANTE):***
Murray Gordon, Janet Gordon, Co-Trustees of the Gordon Family Trust; and Lois Arnold, Trustee of the Richard Arnold Family Trust

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.**

**There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.**

***Tiene 30 DIAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.***

***Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.***

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
Wakefield Taylor Courthouse
725 Court Street Martinez, CA 94553

CASE NUMBER: *(Número del Caso):* C08 00405

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shelley A. Gordon
1946 Embarcadero, Ste. 200
Oakland, CA 94606
Law Offices of Shelley A. Gordon
Bar No. 88475

DATE: *(Fecha)* 2/19/08 CLERK OF THE SUPERIOR COURT Clerk, by *(Secretario)* D. WAGNER, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: OFFICEMAX, INC.
   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]
Martin Dean's Essential Forms TM

SUMMONS

Code of Civil Procedure §§ 412.20, 465

Gordon et al

HARRINGTON, FOXX, DUBROW & CANTER, LLP
KEVIN J. GRAY, State Bar No. 142685
REBECCA T. AMIRPOUR, State Bar No. 221714
655 Montgomery Street, Suite 1100
San Francisco, California 94111
Telephone (415) 288-6600

Attorneys for OFFICEMAX NORTH AMERICA, INC.

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF CONTRA COSTA**

| | |
|---|---|
| MURRAY GORDON, JANET GORDON, CO-TRUSTEES OF THE GORDON FAMILY TRUST AND LOIS ARNOLD, TRUSTEE OF THE RICHARD ARNOLD FAMILY TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICEMAX, INC., DOES 1-20,,<br><br>Defendants. | CASE NO. C08 00405<br><br>**ANSWER TO COMPLAINT FOR DAMAGES, BREACH OF CONTRACT AND COMMON COUNTS** |

COMES NOW Defendant OFFICEMAX NORTH AMERICA, INC., erroneously sued herein as OFFICEMAX, INC., ("OFFICEMAX'), on file herein, for itself alone and no other defendant, admits, denies, and alleges as follows:

1. Pursuant to the provisions of California Code of Civil Procedure, Section 431.30(d), this answering defendant denies generally and specifically each, every and all of the allegations contained in the Complaint, and the whole thereof and denies that plaintiffs sustained or will sustain any damage at all.

/ / /

/ / /

2. Further answering the Complaint, this answering defendant denies that plaintiffs sustained any injury, damage, loss, if any, by reason of any act, omission or negligence on the part of this answering defendant.

**FIRST AFFIRMATIVE DEFENSE**

**(Failure To State Facts)**

3. The Complaint, and each of the purported causes of action contained therein, fail to state facts sufficient to constitute any cause of action against OFFICEMAX, and plaintiffs' action is barred thereby.

**SECOND AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

4. Upon information and belief, OFFICEMAX alleges that the Complaint herein and each and every cause of action contained therein is barred by the applicable statute of limitations, including, but not limited to, Code of Civil Procedure §§ 337, 338, 339, and 343.

**THIRD AFFIRMATIVE DEFENSE**

**(Equitable Estoppel)**

5. Upon information and belief, OFFICEMAX alleges that the Complaint and each and every claim for relief contained therein is barred by reason of acts, omissions, representations, and courses of conduct of plaintiffs on which this answering defendant has relied to its detriment, thereby barring any claims for relief asserted by plaintiffs under the doctrine of equitable estoppel.

**FOURTH AFFIRMATIVE DEFENSE**

**(Voluntary Release and Waiver)**

6. Upon information and belief, OFFICEMAX alleges that the Complaint and each and every cause of action contained therein is unenforceable in that plaintiff has voluntarily and knowingly waived and released valid defenses and other rights.

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

**FIFTH AFFIRMATIVE DEFENSE**

**(In Pari Delicto)**

7. Upon information and belief, OFFICEMAX alleges that each and every purported cause of action contained in the Complaint is barred because plaintiffs have engaged in acts and courses of conduct which renders it in pari delicto.

**SIXTH AFFIRMATIVE DEFENSE**

**(Comparative Fault)**

8. This answering defendant alleges that any damages sustained by plaintiffs, if such occurred, were proximately caused or contributed to by plaintiffs' own fault. Accordingly, plaintiffs' recovery, if any, should be reduced by the amount of fault attributable to plaintiffs' conduct.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

9. The claims asserted in plaintiffs' Complaint are barred by the doctrine of unclean hands.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Compliance with Terms of the Alleged Contract)**

10. OFFICEMAX alleges that it has performed all conditions, covenants, and promises required to be performed by the alleged contract, if any, in accordance with its terms and conditions, or is otherwise excused from such promises, covenants, and conditions.

**NINTH AFFIRMATIVE DEFENSE**

**(Defenses Under the Alleged Contract)**

11. Upon information and belief, OFFICEMAX alleges that OFFICEMAX's duties under the alleged contract, if any, were modified and/or excused, and OFFICEMAX hereby reserves the right to assert such defenses.

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

**TENTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

12. Plaintiff was and is under a duty to minimize the damages and injuries complained of, if any there were; Plaintiff has failed, neglected and/or refused to so minimize such damages and injuries, and by reason of such failure, neglect and/or refusal have increased its damages and injuries, and is not entitled to recover.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Laches)**

13. The Complaint, and each cause of action therein, is barred, in whole or in part, by the doctrine of laches.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Other Parties Responsible)**

14. Any damages sustained by Plaintiffs, if such occurred, were the direct and proximate result of the actions, omissions and breaches by others, all of which were beyond this Defendant's control.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Other Defenses)**

15. Any and all other defenses available to OFFICEMAX are herewith reserved unto it for all purposes and OFFICEMAX hereby reserves the right to amend and supplement its affirmative defenses upon discovery of further information.

/ / /

/ / /

/ / /

/ / /

/ / /

WHEREFORE, OFFICEMAX prays that judgment be entered in its favor and against plaintiffs on the Complaint dismissing all counts thereof and that OFFICEMAX be awarded its costs and expenses, including reasonable attorneys' fees.

DATED: March 27 2008

HARRINGTON, FOXX, DUBROW & CANTER, LLP

By: ______________________

KEVIN J. GRAY
Attorneys for OFFICEMAX NORTH AMERICA, INC

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

PROOF OF SERVICE
***Murray Gordon, et al. v. Office Max, et al.***

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 655 Montgomery Street, Suite 1100, San Francisco, California 94111.

On **March 27, 2008**, I served the foregoing document described as follows:

**ANSWER TO COMPLAINT FOR DAMAGES, BREACH OF CONTRACT AND COMMON COUNTS**

on all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as stated below:

Shelly A. Gordon
Law Offices of Shelly A. Gordon
1946 Embarcadero, Suite 200
Oakland, CA 94606
(510) 535-162

BY MAIL AS FOLLOWS:

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **March 27, 2008**, at San Francisco, California.

☒ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

BERLITA M. UMADHAY

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600

PROOF OF SERVICE

***Murray Gordon, et al. v. Office Max, et al.***

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 655 Montgomery Street, Suite 1100, San Francisco, California 94111.

On **March 27, 2008**, I served the foregoing document described as follows:

**NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441, 1446**

on all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as stated below:

Shelly A. Gordon
Law Offices of Shelly A. Gordon
1946 Embarcadero, Suite 200
Oakland, CA 94606
(510) 535-162

BY MAIL AS FOLLOWS:

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on March 27, 2008, at San Francisco, California.

☐ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

BERLITA M. UMADHAY



JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

EDL

**I. (a) PLAINTIFFS**

Murray Gordon, Janel Gordon, Co-Trustees of the Gordon Family Trust and Lois Arnold, Trustee of the Richard Arnold Family Trust

**DEFENDANTS**

OfficeMax, Inc., Does 1-20

**(b)** County of Residence of First Listed Plaintiff ALAMEDA, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant OHIO and ILLINOIS
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Shelly A. Gordon
Law Offices of Shelly A. Gordon
1946 Embarcadero, Suite 200
Oakland, CA 94606 - (510) 535-1652

Attorneys (If Known)

Kevin J. Gray
HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 Montgomery Street, Suite 1100
San Francisco, CA 94111 - (415) 288-6600

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury—Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities – Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus – Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity):**
28 U.S.C. Sections 1446, 1332(d) and 1441(a)

Brief description of cause:
Breach of Contracct Re: Lease

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** 110,625.75

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** **PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".**

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AND "X" IN ONE BOX ONLY)** ☒ SAN FRANCISCO/OAKLAND ☐ SAN JOSE

DATE
MARCH 27, 2008

SIGNATURE OF ATTORNEY OF RECORD

PROOF OF SERVICE
***Murray Gordon, et al. v. Office Max, et al.***

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 655 Montgomery Street, Suite 1100, San Francisco, California 94111.

On **March 27, 2008**, I served the foregoing document described as follows:

**CIVIL COVER SHEET**

on all interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as stated below:

Shelly A. Gordon
Law Offices of Shelly A. Gordon
1946 Embarcadero, Suite 200
Oakland, CA 94606
(510) 535-162

BY MAIL AS FOLLOWS:

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **March 27, 2008**, at San Francisco, California.

☐ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

B. M.
BERLITA M. UMADHAY

HARRINGTON, FOXX, DUBROW & CANTER, LLP
655 MONTGOMERY STREET, SUITE 1100
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE (415) 288-6600